### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| AXIOM SPACE, INC.<br><br>    Plaintiff,<br><br>      v.<br><br>RAMZI MASRI-ELYAFAOUI,<br><br>    Defendant. | Case No. 4:26-cv-02931 |

## **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

ORRICK, HERRINGTON & SUTCLIFFE LLP

Ryan Wooten
609 Main Street, 40th Floor
Houston, TX 77002
(713) 658-6617
rwooten@orrick.com

Robert S. Shwarts (*pro hac vice*)
405 Howard Street
San Francisco, CA 94105
(415) 773-5760
rshwarts@orrick.com

Melanie K. Chan (*pro hac vice*)
Cameron A. Kasanzew (*pro hac vice*)
51 W 52nd Street
New York, NY 10019
(212) 506-5000
melanie.chan@orrick.com
ckasanzew@orrick.com

*Attorneys for Defendant*

**TABLE OF CONTENTS**

Page

I.    SUMMARY OF THE ARGUMENT ................................................................. 1

II.    STATEMENT OF FACTS ............................................................................. 2

    A.    Defendant's Background and Employment ............................................ 2

        1.    Defendant's Role at Axiom ........................................................ 3

        2.    Defendant's Title Change to Senior Policy Advisor at Axiom.................. 5

        3.    Defendant's Offer from Vast and Negotiations with Axiom..................... 6

    B.    The Agreement.................................................................................. 7

III.    RELEVANT PROCEDURAL BACKGROUND ............................................. 8

IV.    LEGAL STANDARD................................................................................... 9

V.    ARGUMENT............................................................................................. 10

    A.    D.C. Law Applies to the Agreement.................................................... 10

    B.    The Agreement's Noncompete Provisions Are Invalid and Unenforceable........ 12

    C.    Axiom is Not Entitled to Relief on its Remaining Breach of Contract Claims ...................................................................................................... 14

        1.    Axiom Cannot Establish that Defendant Breached the Agreement's Confidentiality Provisions ........................................................ 15

            a.    D.C. Courts Do Not Recognize the Inevitable Disclosure Doctrine............................................................................ 15

            b.    Defendant Does Not Possess, and Did Not Use or Disclose, Axiom's Confidential or Proprietary Information ...................... 16

        2.    Axiom Cannot Establish that Defendant Breached Any "Duty of Trust." ................................................................................... 19

        3.    Axiom Cannot Establish that Defendant Breached the Agreement's Non-Solicitation Provisions ...................................................... 20

VI.    CONCLUSION........................................................................................... 21

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)......................................................................................................9

*Blase Indus. Corp. v. Anorad Corp.*,
442 F.3d 235 (5th Cir. 2006) .......................................................................................10

*Bodenheimer v. PPG Indus., Inc.*,
5 F.3d 955 (5th Cir. 1993) ...........................................................................................10

*Cardoni v. Prosperity Bank*,
805 F.3d 573 (5th Cir. 2015) .............................................................................11, 12, 16

*Crown Castle Fiber LLC v. City of Pasadena*,
618 F.Supp.3d 567 (S.D. Tex. 2022) ...........................................................................15

*DeSantis v. Wackenhut Corp.*,
793 S.W.2d 670 (Tex. 1990)....................................................................................11, 12

*DGM Servs., Inc. v. Figueroa*,
No. 01-cv-00186, 2016 WL 7473947 (S.D. Tex. 2016)..............................................16

*EarthWeb, Inc. v. Schlack*,
71 F.Supp.2d 299 (S.D.N.Y. 1999) .............................................................................16

*EHO360, LLC v. Opalich*,
No. 3:21-cv-0724, 2021 WL 3134304 (N.D. Tex. 2021) ............................................20

*Erie R.R. Co. v. Tompkins*,
304 U.S. 64 (1938)........................................................................................................10

*Exxon Mobil Corp. v. Drennen*,
452 S.W.3d 319 (Tex. 2014)........................................................................................11

*GEO Specialty Chem., Inc v. Husisian*,
951 F.Supp.2d 32 (D.D.C. 2013)................................................................................20

*Golden Spread Coop., Inc. v. Emerson Process Mgmt. Power & Water Sols., Inc.*,
360 F.Supp.3d 494 (N.D. Tex. Jan. 31, 2019) ............................................................10

*Info. Strategies, Inc. v. Dumosch*,
13 F.Supp.3d 135 (D.D.C. 2014) ................................................................................16

ii

*MDK Sociedad De Responsabilidad Limitada v. Proplant Inc.*,
   25 F.4th 360 (5th Cir. 2022) ...................................................................................9

*Mirelez v. State Farm Lloyds*,
   2024 WL 1183542, No. H-23-2315 (S.D. Tex. 2024), *aff'd*, 127 F.4th 949 (5th
   Cir. 2025) ...............................................................................................................10

*Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*,
   783 F.3d 527 (5th Cir. 2015) ...................................................................................9

*Triumph Packaging Grp. V. Ward*,
   834 F.Supp.2d 796 (N.D. Ill. 2011) ........................................................................16

*Turner v. Baylor Richardson Med. Ctr.*,
   476 F.3d 337 (5th Cir. 2007) ...................................................................................10

*Xereas v. Heiss*,
   630 F.Supp.3d 61 (D.D.C. 2022) .............................................................................20

## Statutes

18 U.S.C. § 1905...........................................................................................................19

D.C. Code § 32-581.01 .............................................................................................12, 13

D.C. Code § 32-581.03 .........................................................................................12, 13, 14

## Other Authorities

Fed. R. Civ. P. 56(a) ......................................................................................................9

Restatement (Second) of Conflict of Laws, § 188(2) (1971)...........................................11

Through this Motion for Summary Judgment, Defendant Ramzi Masri-Elyafaoui ("Defendant") seeks dismissal of all claims asserted against him by Plaintiff Axiom Space, Inc. ("Axiom") in its Amended Complaint. As there is no genuine issue of material fact in dispute, Defendant is entitled to judgment as a matter of law.  There is no need for a trial in this matter.

## I.    SUMMARY OF THE ARGUMENT

This action arose when Defendant, a Washington, D.C.-based lobbyist, left his employment with Axiom to join Vast, Inc. ("Vast") in April 2026. Axiom now seeks to enforce the noncompete, non-solicitation, and confidentiality clauses of its Employee Confidential Information and Invention Assignment Agreement ("Agreement") to enjoin Defendant from his employment at Vast. Each of Axiom's claims for breach of the Agreement fails as a matter of law.

*First*, Axiom's claim for breach of the Agreement's noncompete provisions is squarely foreclosed by D.C. law, which governs the Agreement under Texas choice-of-law principles because Defendant performed his services for Axiom in Washington, D.C. Under D.C. law, any agreement containing a noncompete restriction must be provided at least 14 days prior to the start of employment and must specify the functional and geographic scope of the restriction. The Agreement's noncompete provisions are unenforceable on each of these grounds.

*Second*, Axiom's claims for breach of the confidentiality and non-solicitation provisions and "duty of trust" under the Agreement fail because Axiom's motion for injunctive relief, which is the only relief Axiom seeks, is based solely on the breach of the noncompete and fiduciary duty claims asserted in its Original Complaint.

*Third*, Axiom has not established that Defendant possesses, let alone used or disclosed confidential information. This separately bars Axiom's claims for breach of the Agreement based on misuse of confidential information and breach of the "duty of trust," which should also be dismissed as duplicative of its claim for breach of the confidentiality provisions. And Axiom's

claim for breach of the Agreement's non-solicitation provisions fails for the additional reason that Defendant is not taking Axiom's "customers" by engaging with government stakeholders. This is the primary function of his job as a lobbyist, and Axiom cannot enforce an invalid non-compete under the guise of a breach of the Agreement's non-solicitation provisions.

## II.     STATEMENT OF FACTS

### A.     Defendant's Background and Employment.

Defendant is a former Government Relations Manager and Senior Policy Advisor at Axiom. Before Axiom, Defendant began his career as a Government Relations Associate at Virgin Galactic ("Virgin") in Washington, D.C. *See* Declaration of Ramzi Masri-Elyafaoui ("Masri-Elyafaoui Decl.") ¶¶ 1, 5. At Virgin, Defendant worked with Taylor Weeks Armentrout, now Vice President of Government Relations at Axiom, and Jared Stout, who was a consultant for Virgin and now is the Chief Global Policy Officer at Axiom. *See id.* ¶ 7. When Mr. Stout joined Axiom in 2022, he recruited Defendant to join the Government Relations team at Axiom in Washington, D.C. *See id.*

On September 8, 2023, Defendant received an offer of employment for the position of Government Relations Manager at Axiom, which was one step above an entry-level Government Relations Associate position, at an annual salary of $150,000. *See id.* ¶¶ 11, 16. The offer was conditioned on restrictions regarding confidential information and intellectual property that would be memorialized in the separately provided Agreement. *See id.* ¶ 11. The letter did not include any language or provisions relating to a post-employment non-compete. *See id.* Defendant signed the offer letter from Virgin's offices in Washington, D.C. *See id.* ¶ 12.

After not hearing back from Axiom in the week after signing his offer letter, Defendant inquired as to the onboarding documents and Agreement. *See id.* ¶ 13. Axiom did not send the onboarding documents or the Agreement until **October 9, 2023**, only seven days before the start

2

of Defendant's employment at Axiom. *See id.* ¶¶ 13, 14. As Defendant had already left his prior job and could not afford to delay his start date, he signed the Agreement and the other onboarding documents the following day. *See id.* ¶ 14. Defendant did not engage in any negotiations with Axiom regarding the Agreement. *See id.*

### 1.    Defendant's Role at Axiom.

Axiom develops and constructs infrastructure and equipment to be used in space in partnership with its suppliers, of which it has thousands across the country. *See id.* ¶ 9. Axiom and other companies in the aerospace industry rely on authorizations and funding from the National Aeronautics and Space Administration ("NASA") to launch private missions and develop spacecraft. *See id.* Axiom, along with nine other companies, also participates in NASA's Commercial Low Earth Orbit Development Program ("CLD"), which aims to develop a commercial space station that will eventually replace the International Space Station. *See id.* Axiom is also developing the spacesuits for NASA astronauts to wear on the Moon as part of the Artemis Program, a program known as xEVA. *See id.*

As a Government Relations Manager, Defendant acted as Axiom's external-facing representative and advocate on Capitol Hill. *See id.* ¶¶ 10, 18, 19. His primary goals during his employment at Axiom were to obtain greater funding for CLD and the xEVA program and congressional authorizations to develop commercial space stations. *See id.* ¶ 22. This required him to be on the ground in Washington, D.C. at least three times per week, engaging in lobbying efforts, meeting with lawmakers, and attending in-person networking events near Capitol Hill. *See id.* ¶¶ 19, 20.

Defendant's role primarily involved presenting information that could be shared with government stakeholders, industry associations, and other CLD participants. *See id.* ¶ 25. In addition to lobbying and networking in D.C., Defendant, along with Mr. Stout and Ms.

3

Armentrout, would occasionally meet with representatives from the other participants in CLD, including Vast, to discuss lobbying strategy, policy positions, regulatory rulemakings, and exchange information about engagements with government stakeholders to obtain alignment on policy goals and funding requests. *See id.* ¶ 22. These political and regulatory strategies, as well as government relations tactics, were inherently time-sensitive and perishable given that they evolved rapidly with political cycles. *See id.*

Separate from the Government Relations team, Axiom had a team responsible for working on responses to requests for information (RFIs) and requests for proposals (RFPs) from NASA, the Capture team. *See id.* ¶ 23. Defendant never worked on any responses to RFIs or responses to RFPs, and Defendant did not discuss any information related to RFIs or RFPs with the Capture team and never viewed any responses to RFIs or RFPs. *See id.*

Axiom also had internal Science, In-Space Solutions (now Orbital Data Center), and Revenue teams, responsible for confidential pricing and sales strategy, which were effectively siloed from the Government Relations team. *See id.* ¶ 24. This remained the case even following a recent reorganization, when the Revenue team was nominally placed under a single umbrella (Global Strategy) with the Government Relations team. *See id.* ███████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████ *See id.* ¶ 25. ████████████████████████

██████████████████████████████████████████████████████

█████████████████ which was documented in public news sources and on LinkedIn. *See id.*

4

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ *See id.* ¶ 26. However, Defendant

never joined any of those meetings because he had nothing to contribute and ████████████

did not impact his day-to-day duties whatsoever. *See id.*

The only information regarding pricing Defendant had access to at Axiom was an email

that contained a high-level discussion of pricing in connection with a submission to ██

████████████████████████████████████████ *See id.* ¶ 27. Defendant

was only copied on this email because members of the Government Relations team were routinely

copied on submissions to external government representatives, and he never opened the attachment

to the email. *See id.* The only other information Defendant obtained regarding pricing was in a

public document in September 2024 that listed the average price of Axiom's PAM seats at

approximately $40 million per seat. *See id.* Throughout his tenure at Axiom, Defendant never

viewed any documents or discussed any information relating to nonpublic pricing, sales, or

financial projections, and he was not privy to such information. *See id.* ¶ 28.

### 2.     Defendant's Title Change to Senior Policy Advisor at Axiom.

In September 2025, Mr. Stout approached Defendant regarding a change in title to Senior

Policy Advisor, but without any change in salary, and his role remained functionally the same. *See*

*id.* ¶¶ 31, 32. Defendant accepted the title change but explained that he expected a reconsideration

of his salary in the next performance review. *See id.* ¶ 31.

Defendant had his next performance review with Ms. Armentrout on March 4, 2026, where

Ms. Armentrout informed him that he would only receive a 3% raise in his salary. *See id.* ¶ 33.

When Defendant inquired as to why, Ms. Armentrout said that he was not ready for a promotion

5

and that she did not believe he deserved a further raise. *See id.* ¶ 34. At that point, Defendant decided to leave Axiom. *See id.*

### 3.     Defendant's Offer from Vast and Negotiations with Axiom.

That same day as his review, Defendant called Caryn Schenewerk, Chief Policy Officer at Vast, to express his interest in joining her at Vast. *See id.* ¶ 35. Ms. Schenewerk and Defendant previously met at Georgetown University Law Center, where she taught his course on Commercial Space Law and inspired him to pursue a career in government relations. *See id.* ¶ 3. On April 10, 2026, Defendant received an offer to join Vast as a Director of Policy and Government Relations in their Washington, D.C. office, with an annual salary of $200,000. *See id.* ¶ 37. Similar to his role at Axiom, Defendant's role at Vast is external-facing and involves advocating for Vast's position with respect to funding and policy, including on CLD. *See id.* ¶ 43. Unlike with his role at Axiom, however, Defendant will represent Vast's interests with respect to the U.S. Department of Defense, California local and state government officials, as well as represent its interests with respect to other parts of its space portfolio in addition to CLD. *See id.*

Defendant accepted the offer of employment from Vast on April 10, 2026, and immediately notified Ms. Armentrout. *See id.* ¶¶ 37, 38. Defendant was logged out of his work-issued devices less than 30 minutes later. *See id.* ¶ 38.

On April 13, 2026, Defendant received a voicemail from Axiom's Chief Legal Officer and General Counsel, Tracey Davies, and immediately returned her call. *See id.* ¶ 39. Ms. Davies told Defendant that she could not let him go to Vast, and that Axiom was preparing to file a lawsuit against him. *See id.* ¶ 40. Although he did not have access to Axiom's confidential pricing or strategy information, Defendant assured Ms. Davies that he would never share any information with Vast that might be considered confidential. *See id.*

6

Ms. Davies offered to pay Defendant his full annual salary in exchange for not joining Vast or any other participant in CLD. *See id.* Defendant responded that he would need to have a conversation with Vast and asked if Axiom would match his offered salary at Vast. *See id.* ¶ 41. Ms. Davies said she would get back to him, but she never did. *See id.* Instead, Axiom filed this action the same day as Defendant's conversation with Ms. Davies. *See id.*

Defendant began his employment at Vast on April 14, 2026 and returned all Axiom-issued equipment to Axiom on April 16, 2026. *See id.* ¶¶ 42, 43. Defendant did not retain any confidential information or documents from Axiom. *See id.* ¶ 42. Since joining Vast, and to his knowledge, Defendant has not used or disclosed any Axiom confidential information. *See id.* ¶ 47.

## B. The Agreement.

The Agreement that Defendant signed on October 10, 2023, six days prior to the start of his employment with Axiom, contained restrictions on the use of Axiom's confidential information, defined as ███████████████████████████████████████████ ████████████████████████████████████████ *See* Agreement § 1.2. The Agreement also contained restrictions on solicitation of any ██████████████████████████ ████████████████████████████████ *See id.* § 5.1. The Agreement broadly defines any ████████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

*Id.* § 5.2. The Agreement also contains the following non-compete provisions:

7



*Id.* §§ 6.1–6.3. The Agreement contains no choice-of-law provision. *See generally id.*

### III.   <u>RELEVANT PROCEDURAL BACKGROUND</u>

On April 13, 2026, Axiom filed its Original Complaint ("Complaint") against Defendant, alleging that Defendant breached the noncompete provisions of the Agreement and his fiduciary duties by accepting employment with Vast while in possession of Axiom's confidential information. *See* ECF 1, Compl. ¶¶ 6, 35, 37, 44. On April 14, 2026, Axiom filed its Motion for and Briefing in Support of Temporary Restraining Order and Preliminary Injunction (as corrected on April 16, 2026) (the "TRO Motion") based on the causes of action asserted in the Complaint, seeking an emergency *ex parte* temporary restraining order and preliminary injunction to enjoin Defendant from beginning his employment with Vast. *See* ECF 13, TRO Mot. at 1. Defendant filed his Opposition to the TRO Motion on April 21, 2026. *See* ECFs 27, 28 (as corrected on April

8

22, 2026). After holding a hearing on April 23, 2026, the Court denied the TRO Motion on April 27, 2026 and set a trial date for June 29, 2026. *See* ECFs 32, 35.

On April 30, 2026, Axiom filed its Amended Complaint. *See* ECF 38. In the Amended Complaint, Axiom claims that Defendant "had access to and knowledge of Axiom's most sensitive Confidential Information, including competitive analysis regarding Axiom Space's competitors, the status of Axiom Space's space station program, legislation and rulemaking strategies, customer information, messaging strategies, and other strategic initiatives," and that Defendant's employment with Vast "requires that he improperly disclose and use Axiom Space's Confidential Information for the benefit of a direct competitor." Am. Compl. ¶¶ 30, 45. In the Amended Complaint, Axiom withdrew its breach of fiduciary duty claim and, in addition to breach of the Agreement's noncompete provisions, asserts three new causes of action for breach of contract: breach of the Agreement's confidentiality provisions; breach of the "duty of trust" under the Agreement; and breach of the Agreement's non-solicitation provisions. *See id.* ¶¶ 50-78. Axiom does not assert a claim for damages, and solely seeks injunctive relief. *See id.* at 20-21.

## IV.    LEGAL STANDARD

A party is entitled to summary judgment when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the non-moving party bears the burden of proof at trial, the movant "may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is [a dispute] of material fact warranting trial." *MDK Sociedad De Responsabilidad Limitada v. Proplant Inc.*, 25 F.4th 360, 368 (5th Cir. 2022) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th

Cir. 2015)). "A dispute of material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Mirelez v. State Farm Lloyds*, 2024 WL 1183542, No. H-23-2315 at *2 (S.D. Tex. 2024) (Hittner, J.), *aff'd*, 127 F.4th 949 (5th Cir. 2025) (quoting *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993) (internal quotation marks omitted)). "[T]he nonmoving party's bare allegations, standing alone, are insufficient to create a material dispute of fact . . . [t]he nonmovant's burden cannot be satisfied by 'conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.'" *Id.* (quoting *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007)).

## V.    ARGUMENT

Defendant is entitled to summary judgment on all of Axiom's claims for breach of contract because the Agreement's noncompete provision is invalid and unenforceable, the injunctive relief requested is limited to the noncompete provision, and there is no genuine dispute of material fact that Defendant did not breach the Agreement's non-solicitation and confidentiality provisions.

### A.    D.C. Law Applies to the Agreement.

This Court in a diversity case will apply Texas choice-of-law principles. *See Golden Spread Coop., Inc. v. Emerson Process Mgmt. Power & Water Sols., Inc.*, 360 F.Supp.3d 494, 518 (N.D. Tex. Jan. 31, 2019) ("When sitting in diversity jurisdiction, a federal court applies the law of the state in which it sits.") (citing *Blase Indus. Corp. v. Anorad Corp.*, 442 F.3d 235, 238 (5th Cir. 2006); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79-80 (1938)). Texas law is clear that under its choice-of-law principles, D.C. law applies to the Agreement. As noted, the Agreement contains no governing law provision—which Axiom could easily have included if it intended Texas law to govern. In deciding which state's law will govern absent a choice-of-law provision, Texas courts look to which state has the "more significant relationship," considering: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the

10

location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Cardoni v. Prosperity Bank*, 805 F.3d 573, 582 (5th Cir. 2015) (quoting Restatement (Second) of Conflict of Laws, § 188(2) (1971)). Under Texas law, the place of performance is "deemed to be conclusive in determining what state's law is to apply." *Id.* at 583 (quoting *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 679 (Tex. 1990)). In *Cardoni*, while Prosperity was incorporated in Texas, the court found "[m]ost significant [that] the bankers performed … most of their work for Prosperity, in Oklahoma." *Id.*; *see also Exxon Mobil Corp. v. Drennen*, 452 S.W.3d 319, 326 (Tex. 2014) ("While the transactions and parties bear relations to both states," New York had more significant relationship given that employee "spent three years of his career with ExxonMobil working in its New York City office.").

Here, it is undisputed that performance of Defendant's job with Axiom as a Government Relations Associate and Senior Policy Advisor required him to be on the ground in Washington, D.C. *See* Masri-Elyafaoui Decl. ¶ 18. His core job functions were lobbying efforts, meetings with lawmakers, and attendance at networking events at or in the proximity of Capitol Hill. *See id.* ¶ 19. Defendant also worked from Axiom's office space in Washington, D.C., where he attended in-person weekly meetings as required until Axiom closed the space due to financial difficulties in October 2024. *See id.* ¶ 20. Even following this closure, Defendant was in Washington, D.C. at least three times per week throughout his employment at Axiom. *See id.* Indeed, it is improbable that Axiom would have hired Defendant if he was not located in or able to easily commute to D.C, as this was essential for the performance of his duties. *See id.* ¶ 19. And although the place of performance is "conclusive" with respect to the choice-of-law analysis, *Cardoni*, 805 F.3d at 583, Defendant also executed his offer letter in Washington, D.C. and the subject matter of the Agreement related to information Defendant might obtain in the course of performing his job

11

duties there. *See id.* ¶ 11; *see generally* Agreement.[1] As such, the Agreement is governed by D.C. law.

**B.      The Agreement's Noncompete Provisions Are Invalid and Unenforceable.**

Defendant is entitled to summary judgment on Axiom's claim for breach of the noncompete provisions because such provisions are invalid and unenforceable under D.C. law for three independent reasons. Following its significant 2022 amendments, D.C. Law 24-175 (codified at D.C. Code §§ 32-581.01, *et seq.*) provides that competitive restrictions contained in agreements for employees such as Defendant are invalid where, as here, they were not provided at least 14 days prior to the start of employment, do not specify the nature of the restrictions, or do not provide a geographical limitation.

Under Section 32-581.03, "a non-compete agreement between an employer and a highly compensated employee executed on or after October 1, 2022" is only "valid and enforceable" if the agreement specifies "the functional scope of the competitive restriction, including what services, roles, industry, or competing entities the employee is restricted from performing work in or on behalf of," and "the geographical limitations of the work restriction." D.C. Code § 32-581.03(a)(1)(A), (B). It also provides that the employer must "provide the non-compete provision to the employee in writing [] [a]t least 14 days before the individual commences employment for the employer." *Id.* § 32-518.03(a)(2)(A). Section 32-581.01, in turn, defines a "highly compensated employee" as an employee expected to earn at least $150,000 annually and a "non-

---

[1] Even if the Agreement contained a choice-of-law provision—which it does not—D.C. law would still apply. A choice-of-law provision will not stand if application of the chosen state's law "would contravene a fundamental policy" of the state where employees are located. *Cardoni*, 805 F.3d at 585. The focus is on whether "courts of the state will refuse to enforce an agreement contrary to that law, despite the parties' original intentions, and even though the agreement would be enforceable in another state connected with the transaction." *Id.* (quoting *DeSantis*, 793 S.W.2d at 680) (internal quotation marks omitted). Here, a D.C. court would decline to enforce the noncompete given that it is contrary to D.C. Code §§ 32-581.01, *et seq.*

compete provision" as "a provision in a written agreement … that prohibits an employee from performing work for another for pay." *See id.* § 32-518.01(10)(A), (13)(A)(i), (15).[2]

At the outset, regardless of the language, the noncompete provision in the Agreement is barred by the undisputed fact that Axiom failed to provide the Agreement to Defendant at least 14 days in advance of the start of his employment. Axiom's September 8, 2023 offer letter to Defendant noted that his employment was conditioned on signing the Agreement, which would be provided separately. *See* Masri-Elyafaoui Decl. ¶ 11. The offer letter contained no language or provisions relating to any competitive restrictions. *See id.* Despite specific inquiries from Defendant, Axiom did not send Defendant the Agreement until **October 9, 2023**—only *seven days* before he started his employment with Axiom on October 16, 2023.  *See id.* ¶¶ 13, 14. On this basis alone, the non-compete provision is unenforceable under D.C. law.

The Agreement's noncompete provisions are also invalid and unenforceable on the separate grounds that they fail to specify the "services, roles, industry, or competing entities" or the "geographical limitations" to which the restrictions on competition applied. Sections 6.1 and 6.2 of the Agreement prohibit Defendant from engaging in ▮▮▮▮▮▮▮▮▮▮▮ defined broadly as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ Agreement §§ 6.1–6.2. These provisions are invalid and unenforceable under Section 32-581.03(a)(1)(A) because they do not provide the type of services Axiom provides, the roles

---

[2] The noncompete provisions in the Agreement are subject to Section 32-581.03's requirements because Defendant earned an annual salary of $150,000 at Axiom, signed the Agreement on October 10, 2023, and the Agreement prohibits him from performing work for a competing business. *See* Masri-Elyafaoui Decl. ¶¶ 11, 15; Agreement §§ 6.1-6.3.

Defendant is prohibited from taking and at which companies, and the industries that Axiom is engaged in. Nor is any clarity regarding these restrictions provided elsewhere in the Agreement.[3]

Under Sections 6.1 and 6.3 of the Agreement, Defendant is also prohibited from providing such services ████████████████████████ which includes ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ *Id.* §§ 6.1, 6.3. While Axiom claims that the jurisdictions in which Axiom Space does business "include Harris County and Washington, D.C.," Am. Compl. ¶ 35, Axiom does not solely do business in these locations, but has thousands of suppliers across the country. *See* Masri-Elyafaoui Decl. ¶ 9. As such, the sweeping language of the Agreement effectively eliminates any geographical limitation on competing activity and is unenforceable pursuant to Section 32-581.03(a)(1)(B).[4]

### C.    Axiom is Not Entitled to Relief on its Remaining Breach of Contract Claims.

At the outset, Defendant is entitled to summary judgment on Axiom's remaining claims because any injunctive relief, which is the only relief Axiom seeks, is limited to their claim for breach of the noncompete. Axiom filed its TRO Motion based on the causes of action in its first Complaint: breach of the noncompete and breach of fiduciary duties. The motion did not address

---

[3] While Axiom alleges that Defendant "would have known that the [Agreement]'s scope restriction was limited to not working for direct competitors in areas of commercial space stations and PAMs," and that "the competitors at issue in this context are Vast and Voyager," Am. Compl. ¶ 35, that is not what the Agreement says. If Axiom intended to clarify the scope of the restriction, it could have done so in the Agreement.

[4] Axiom's own conduct also undermines its position that the noncompete provision in the Agreement is enforceable. In response to Defendant's notice to Axiom that he was leaving his employment to join Vast, Axiom offered to pay him his *full salary for an entire year*—presumably, they would not have made that offer if they believed that the noncompete restrictions clearly barred his employment with Vast. *See* Masri-Elyafaoui Decl. ¶ 40.

Axiom's claims in the Amended Complaint for breach of contract based on the Agreement's confidentiality provisions, non-solicitation provisions, and "duty of trust." Nor has Axiom set forth the grounds for injunctive relief on these causes of action or addressed the factors required for such relief[5] in a motion or in the Amended Complaint. Even if Axiom's remaining claims were not independently foreclosed on this basis, Axiom fails to establish that Defendant breached the non-solicitation and confidentiality clauses or "duty of trust" under the Agreement.

### 1. Axiom Cannot Establish that Defendant Breached the Agreement's Confidentiality Provisions.

Defendant is entitled to summary judgment on Axiom's claim for breach of the Agreement's confidentiality provisions because Axiom cannot establish that Defendant possesses, used, or disclosed Axiom's confidential information.

### a. D.C. Courts Do Not Recognize the Inevitable Disclosure Doctrine.

Axiom does not allege that Defendant has used Axiom confidential information during his employment with Vast. It cannot. Axiom does not allege that Defendant has disclosed Axiom confidential information during his employment with Vast. It cannot.

Rather, Axiom asserts that Defendant's employment with Vast violates the confidentiality provisions of the Agreement because his role "necessarily depends on the confidential strategy and information he acquired at Axiom Space" and "requires him to access and use the Confidential Information with which Axiom Space entrusted him in confidence." Am. Compl. ¶¶ 47, 59; *see also id.* ¶ 69. These allegations rely on the inevitable disclosure doctrine, which "allows a plaintiff to prove trade secret misappropriation by demonstrating that defendant's new employment will

---

[5] *See Crown Castle Fiber LLC v. City of Pasadena*, 618 F.Supp.3d 567, 590 (S.D. Tex. 2022) (plaintiff seeking permanent injunction "must demonstrate: (1) an actual success on the merits; (2) a substantial threat of immediate and irreparable harm for which it has no adequate remedy at law; (3) that greater injury will result from denying the injunction than its being granted; and (4) that an injunction will not disserve the public interest" (citation modified)).

inevitably lead them to rely on the plaintiff's trade secrets." *Info. Strategies, Inc. v. Dumosch*, 13 F.Supp.3d 135, 143 (D.D.C. 2014) (citation modified).

D.C. courts, however, do not recognize the inevitable disclosure doctrine. The *Info. Strategies* court observed that it was "unaware of any cases in which the D.C. courts have addressed this doctrine," and therefore declined to apply it in that case. *Id.*[6] Further, even in jurisdictions where it is applied, courts have cautioned that "the inevitable disclosure doctrine treads an exceedingly narrow path through judicially unfavored territory," and "[a]bsent evidence of actual misappropriation by an employee, [] should be applied in only the rarest of cases." *EarthWeb, Inc. v. Schlack*, 71 F.Supp.2d 299, 310 (S.D.N.Y. 1999); *see also Triumph Packaging Grp. V. Ward*, 834 F.Supp.2d 796, 809 (N.D. Ill. 2011) ("Courts do not often apply the inevitable disclosure doctrine, recognizing that a broad application would be an effective bar against employees taking similar positions with competitive entities.") (citation modified); *DGM Servs., Inc. v. Figueroa*, No. 01-cv-00186, 2016 WL 7473947, at *5 (S.D. Tex. 2016) (as "Texas courts have not adopted the inevitable disclosure doctrine," trial court was not required to relieve plaintiff of proving elements of its claim for injunctive relief).

### b.  Defendant Does Not Possess, and Did Not Use or Disclose, Axiom's Confidential or Proprietary Information.

While Axiom claims that Defendant had access to unspecified confidential "political, legislative, rulemaking, and regulatory strategies, competitive positioning, customer relationships, and strategic business plans," Am. Compl. ¶ 42, these allegations are directly contradicted by Defendant's public-facing role and responsibilities. Defendant's external-facing role meant that he

---

[6] Even if the Agreement was governed by Texas law—which it is not—Texas likewise does not recognize the inevitable disclosure doctrine. *See Cardoni*, 805 F.3d at 589-90 (rejecting argument that "Texas law presumes … disclosure under the 'inevitable disclosure' doctrine" and noting that no Texas court has adopted such a "categorical rule") (collecting cases).

16

did not use or access information relating to Axiom's "strategic business plans and pricing" or "competitive positioning." *Id.* ¶¶ 5, 42. His duties as a Government Relations Manager and Senior Policy Advisor were to present information that could be shared with government stakeholders, industry associations, and other CLD participants. *See* Masri-Elyafaoui Decl. ¶ 25. He had no reason to be, and was not involved in, decisions regarding confidential pricing and sales strategy. Those decisions were made by Axiom's internal Science, In-Space Solutions (now Orbital Data Center), and Revenue teams, which contrary to Axiom's allegations, were effectively siloed from the Government Relations team throughout Defendant's time at Axiom. *See id.*

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████  *See id.* Defendant's knowledge of any pricing was limited to a public report on the average price of a PAM seat and a single email containing high-level information that was shared with government representatives. *See id.* ¶ 27. Throughout his time at Axiom, Defendant never viewed any documents or discussed any information relating to nonpublic sales, pricing, or financial projections. *See id.* ¶ 28. Nor did he retain any confidential documents or information from Axiom. *See id.* ¶ 42.[7]

Further, Axiom's "political, legislative, rulemaking, and regulatory strategies" were by their nature not proprietary or confidential. Am Compl. ¶ 42. Representatives from companies in the same industry commonly exchange information, work together to lobby stakeholders for additional funding or industry-wide policies, and frequently move between companies. *See* Masri-

---

[7] While Axiom claims that Defendant had access to "competitive analysis regarding Axiom Space's competitors," Am. Compl. ¶ 30, the only "competitive analysis" Defendant is aware of refers to a PowerPoint presentation regarding Congressional perception of the reputations for companies participating in CLD. It contained no information regarding pricing or strategy, and Defendant did not review any such information in preparing the report. *See* Masri-Elyafaoui Decl. ¶ 29. Moreover, Defendant does not possess this report. *See id.*

17

Elyafaoui Decl. ¶ 21. To the extent that Axiom had any political, legislative, rulemaking, or regulatory strategy that involved Defendant, it involved lobbying government stakeholders for funding for CLD and the xEVA program and Congressional authorizations to develop commercial space stations. *See id.* ¶ 22. Such actions occurred in the public sphere, and Axiom's strategy with respect to industry policy and funding objectives was often shared with other participants in CLD, including Vast. *See id.*

Indeed, Axiom does not identify any specific documents or information that Defendant purportedly possesses, let alone used or disclosed in his employment at Vast. While Axiom claims that Defendant "actively participated in highly confidential meetings and was engaged in the development of strategy involving Axiom Space's response" to NASA's March 25, 2026 RFI, Am. Compl. ¶ 46, Axiom fails to identify what confidential information with respect to Axiom's response that Defendant allegedly possesses or revealed to Vast. Moreover, Defendant never worked on a response to any RFI (or RFP), which were the sole responsibility of Axiom's separate Capture team, and the March 25, 2026 RFI is no longer going forward. *See* Masri-Elyafaoui Decl. ¶¶ 23, 44. Likewise, while Axiom asserts that Defendant's presence "at a hearing of the U.S. House Committee on Science, Space, and Technology on NASA's budget" was "precisely the type of government engagement … that the [Agreement]'s non-solicitation and confidentiality provisions were designed to prevent," Am. Compl. ¶ 47, Axiom does not point to any confidential information that was disclosed at or in connection with this public hearing.

Axiom's only reference to any identifiable information is in two paragraphs of Defendant's declaration in support of Defendant's TRO Opposition and a single email chain attached as an exhibit to the Amended Complaint, which only underscore that Defendant did not have access to any nonpublic information. The paragraphs in Defendant's Opposition to the TRO Motion merely

18

state, as noted above,

Axiom disclosed

and such efforts were also publicly documented. *See* Masri-Elyafaoui Decl. ¶ 25.

With respect to                                    Defendant did not participate in any of those

discussions and therefore possesses no information as to what was discussed. *See id.* ¶ 26. Lastly,

the email chain attached as an exhibit to the Amended Complaint relates to a submission to a third

party,

                                 *See id.* ¶ 27. Defendant was only copied on the chain

because it involved a submission to the government, and he never opened the attachment. *See id.*[8]

### 2.   Axiom Cannot Establish that Defendant Breached Any "Duty of Trust."

Defendant is entitled to summary judgment on Axiom's claim for breach of contract based

on the "duty of trust" because any such breach is duplicative of their claim for breach of the

confidentiality provisions. And to the extent the Amended Complaint can be read to assert a breach

of fiduciary duty, that claim is foreclosed by their failure to establish that Defendant used or

disclosed Axiom's confidential information.

Here, Axiom claims that Defendant breached the contract because he "owed fiduciary

duties of loyalty and fidelity to Axiom Space" that "arise from and are defined by the [Agreement]

---

[8] Axiom also claims that information it shared with the U.S. government was protected by the "Trade Secrets Act [sic], 18 U.S.C. § 1905." However, the Defend Trade Secrets Act protects information pertaining to a company's "trade secrets, processes, operations, style of work, or apparatus" and its "identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures[.]" 18 U.S.C. § 1905. Axiom has not shown that its "competitive analysis," "status of [its] space station program, legislation and rulemaking strategies, customer information, messaging strategies, and other strategic initiatives," Am. Compl. ¶ 30, or any of the information Defendant had access to qualifies as a "trade secret" within this definition.

and the confidential relationship established thereunder." Am. Compl. ¶ 66. No such duties of

loyalty or fidelity, however, are set forth in the Agreement aside from the ██████████████

██████████    *See* Agreement § 4 (emphasis added). Instead, Axiom appears to rely on the

Agreement's restrictions on disclosure of confidential information. *See* Am. Compl. ¶ 67. This

claim is therefore duplicative of their claim for breach of confidential information and should be

dismissed. *See Xereas v. Heiss*, 630 F.Supp.3d 61, 67 (D.D.C. 2022) (Where a party alleges a

breach of contract based on fiduciary duty, "a party cannot recover the same damages twice, even

though the recovery is based on two different theories.").[9]

### 3.    Axiom Cannot Establish that Defendant Breached the Agreement's Non-Solicitation Provisions.

Defendant is entitled to summary judgment on Axiom's claim for breach of the

Agreement's non-solicitation provisions because engaging with government stakeholders is not

taking Axiom's "customers." Rather, it is the nature of his role as a lobbyist, and Axiom's claim

for breach of the Agreement's non-solicitation provisions is an attempt to enforce the Agreement's

invalid restrictions on competition.

Axiom claims that Defendant's role at Vast requires him to "solicit and engage with the

same government agencies, legislators, and regulatory bodies that constituted Axiom Space's

actual and potential customers during Defendant's employment," including "NASA, members of

---

[9] While Axiom asserts only a breach of contract, any claim for breach of fiduciary duties independent of the contract would also be foreclosed by Axiom's failure to establish that Defendant used or disclosed Axiom's confidential information. *See, e.g., EHO360, LLC v. Opalich,* No. 3:21-cv-0724, 2021 WL 3134304, at *10 (N.D. Tex. 2021) (denying breach of fiduciary claim based on use of confidential information where "[p]laintiff provide[d] no facts or context for [plaintiff]'s allegation that [defendant] used [p]laintiff's confidential information" (citation to complaint omitted)); *GEO Specialty Chem., Inc v. Husisian*, 951 F.Supp.2d 32, 44 (D.D.C. 2013) (dismissing claim for breach of fiduciary duty where "[t]he complaint merely allege[d] that the disclosure of GEO's confidential information would cause GEO significant harm … but it [did] not say that any actual disclosure has occurred or that any harm has been suffered as a result of defendants' work for the [competitor]"). Therefore, no breach of a "duty of trust" can be inferred from the Agreement or arise from Defendant's employment at Vast.

the U.S. Congress and their staff, the White House, and other government stakeholders[.]" Am. Compl. ¶ 74. Such government entities and their representatives were not Axiom's customers, but third parties with whom Axiom (as well multiple other space companies) engaged to represent their interests in space policy, including submitting appropriations requests and advocating for industry-wide goals. Representing Vast's interests does not impact Axiom's ability to also represent its interests, and it does not deprive Axiom of any opportunities to partner with government stakeholders.

Moreover, Axiom's interpretation of the non-solicitation provision effectively renders it a covenant not to compete, as a prohibition on engaging with any government representatives would prevent Defendant from performing his job entirely. The noncompete provisions are barred by D.C. law, *see supra,* Section V(B), and Axiom cannot bootstrap those unenforceable provisions into a claim for breach of the Agreement's non-solicitation provisions.

## VI.　<u>CONCLUSION</u>

For the foregoing reasons, Defendant respectfully requests that this Court grant Defendant summary judgment on all claims asserted by Axiom in the Amended Complaint.

21

Dated: June 1, 2026                    /s/ *Ryan Wooten*

Ryan Wooten
ORRICK, HERRINGTON & SUTCLIFFE LLP
609 Main Street, 40th Fl.
Houston, TX 77002
(713) 658-6617
rwooten@orrick.com

Robert S. Shwarts (*pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
(415) 773-5760
rshwarts@orrick.com

Melanie K. Chan (*pro hac vice*)
Cameron A. Kasanzew (*pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 W 52nd Street
New York, NY 10019
(212) 506-5000
melanie.chan@orrick.com
ckasanzew@orrick.com

*Attorneys for Defendant*

22

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2026, I caused the foregoing document to be electronically filed using the CM/ECF system, which will send notification of such filing to all counsel of record.


*/s/ Ryan Wooten*
Ryan Wooten

23