UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| AXIOM SPACE, INC.<br><br>Plaintiff,<br><br>v.<br><br>RAMZI MASRI-ELYAFAOUI,<br><br>Defendant. | Case No. 4:26-cv-02931<br><br>**DECLARATION OF<br>RAMZI MASRI-ELYAFAOUI** |

I, Ramzi Masri-Elyafaoui, declare pursuant to 28 U.S.C. § 1746 as follows:

1.      I am a former Government Relations Manager and Senior Policy Advisor for plaintiff Axiom Space, Inc. ("Axiom"). I am the Defendant in the above-captioned matter, and I make this Declaration in support of my Motion for Summary Judgment.

**A. Background and Employment Prior to Axiom.**

2.      Although I do not practice law, I am a lawyer by training. I attended law school at Wayne State University Law School in Detroit, Michigan beginning in September 2017, specializing in space law.

3.      During my third year of law school, I attended Georgetown University Law Center in Washington, D.C. as a visiting student to specialize in space law and policy. There, I took two courses on space law: Commercial Space Law and International Space Law. Caryn Schenewerk, who at the time was Senior Counsel and Senior Director of Space Flight Policy at SpaceX and currently serves as Chief Policy Officer at Vast Inc. ("Vast"), was my professor of Commercial Space Law at Georgetown. She quickly became a mentor. Based on her recommendation, I accepted a position with the White House's Office of Management and Budget's Office of Information and Regulatory Affairs.  She inspired me to pursue a career in government relations.

4.      I graduated from Wayne State University Law School in May 2020. After I passed the D.C. Bar exam in October 2020 and while I was looking for a job, I accepted a research assistant position with Ms. Schenewerk and my professor of International Space Law, Steve Mirmina, to help them write a textbook on space law. When a position at Virgin Galactic ("Virgin") opened, Ms. Schenewerk reached out to the hiring manager to advocate for me. Therefore, having the opportunity to work with Ms. Schenewerk again was instrumental in my decision to eventually join Vast.

5.      I joined Virgin as a Government Relations Associate in Washington, D.C. in April 2021. I worked at Virgin until October 2023.

6.      At Virgin, I primarily engaged in regulatory and policy work and handled New Mexico State government affairs. I would routinely work with competitors in the industry to draft comments to various rulemakings from agencies such as the Federal Aviation Administration, Federal Communication Commissions, or the National Transportation Safety Board. A major part of my role was serving as the liaison between the company and government stakeholders.

7.      During my time at Virgin, I worked with Taylor Weeks Armentrout, who is now the Vice President of Government Relations at Axiom. I also worked with Jared Stout, previously a consultant for the Government Relations team at Virgin. Mr. Stout is now the Chief Global Policy Officer at Axiom. When Mr. Stout took a position at Axiom in 2022, he asked me to join him a few months later. I decided to join Axiom because I found the idea of advancing humanity's presence in space to be profoundly inspiring. The only difference between my role at Axiom and my role at Virgin was that federal lobbying was a bigger part of my role at Axiom.

2

**B. Employment with Axiom.**

**i.    Axiom's Offer Letter and Noncompete Agreement.**

8.    On June 21, 2023, I applied for the Government Relations Manager position at Axiom. On August 1, 2023, I interviewed virtually with Mr. Stout at Axiom for a position as Government Relations Manager in Washington, D.C.

9.    Axiom is an aerospace company that develops and constructs infrastructure and equipment to be used in space in partnership with its suppliers, of which it has thousands across the country. Axiom and other companies in the aerospace industry rely on authorizations and funding from the National Aeronautics and Space Administration ("NASA") to launch private missions and develop spacecraft. Axiom, along with nine other companies, also participates in NASA's Commercial Low Earth Orbit Development Program ("CLD"), which aims to develop a commercial space station that will eventually replace the International Space Station. Axiom is also developing the spacesuits for NASA astronauts to wear on the Moon as part of the Artemis Program, a program known as xEVA. The focus of my work was to represent Axiom and its CLD and xEVA program with Congress and other executive agencies.

10.    As described by Axiom, the Government Relations Manager position entailed acting as a medium between Axiom and its government stakeholders. It also required me to work in Washington, D.C. several times a week and conduct most of that work on Capitol Hill or at federal agencies in D.C.

11.    On September 8, 2023, I received an offer letter of employment from Axiom by email. That letter provided that I would begin employment at Axiom on October 16, 2023 as a Government Relations Manager at an annual salary of $150,000, with a sign-on bonus of $10,000. It also provided that the offer of employment was conditioned on the signing of a separate

Employee Confidential Information and Intellectual Property Assignment Agreement ("Agreement"). The offer letter did not include any language or provisions relating to a post-employment non-compete. A true and correct copy of my September 8, 2023 offer letter from Axiom is attached hereto as **Exhibit 1.**

12.     I signed my offer letter on September 14, 2023 at the Virgin office in Washington, D.C., located at 750 17th Street NW.

13.     During the following week, I did not hear back from Axiom regarding the Agreement and other onboarding documents. On September 21, 2023, I reached out to Eric Williams, a Recruiter at Axiom's Human Resources Department, by email to inquire as to the status of the onboarding documents, which included the Agreement. Mr. Williams responded that Axiom would not send the onboarding documents, which would include the Agreement, until closer to my start date of October 16, 2023. A true and correct copy of my September 14-21, 2023 correspondence with Mr. Williams is attached hereto as **Exhibit 2.**

14.     I did not receive the onboarding documents until **October 9, 2023**, which was also my last day at Virgin. Along with these documents, I received the Agreement. I felt obligated to sign the Agreement without having the opportunity to meaningfully evaluate or negotiate its terms because I had already left my previous job and could not afford to delay the onboarding any longer.

15.     The following day, on October 10, 2023, I reviewed and electronically signed the Agreement and onboarding documents from my home in Chester, Maryland. A true and correct copy of the Agreement, as well as the electronic signatures information on the last page indicating the dates on which it was requested and signed, is attached hereto as **Exhibit 3.**

### ii.    My Role as Government Relations Manager.

16.    On October 16, 2023, I started my employment with Axiom as part of Axiom's Government Relations team. As a Government Relations Manager, I was one step above my prior role at Virgin as a Government Relations Associate, an entry-level position. I reported to Mr. Stout, who was then the Vice President of Government and External Relations, until Ms. Armentrout joined Axiom as Vice President of Government Relations in May 2025 and became my supervisor.

17.    At the time I joined, Axiom maintained a coworking space at The Yard in Washington, D.C., and employees in the Government Relations team often met there for meetings.[1] I was expected to work from this space whenever there was a meeting, which was at least once a week when I first got started.

18.    In addition, by nature of my role as an intermediary between Axiom and government stakeholders, the performance of my job required that I be on the ground in Washington, D.C.

19.    My core job functions in Washington D.C. included significant lobbying efforts on Capitol Hill, meetings with lawmakers, briefing federal agency staffers on Axiom's policy positions, and attendance at in-person networking events, including drinks, dinners, and social events in the proximity of Capitol Hill and other federal agency locations. I could not have performed these services if I was not in Washington, D.C. I was also told in my interview with Mr. Stout that the position would be based in Washington D.C., and the job posting for the Government Relations Associate position stated that the job was located in D.C. Indeed, I strongly

---

[1] All members of the Government Relations team were based in D.C. Washington, D.C. served as a key hub for sales. Mr. Stout, who was in charge of all sales, worked from D.C. and was based in the D.C. area, a significant portion of the Revenue team was located there, and Axiom's Chief Executive Officer was also located in the D.C. area.

believe that Axiom would not have hired me if I was not located in or able to easily commute to Washington D.C.[2]

20.     While Axiom closed its coworking space in September of 2024 due to financial difficulties, this did not alter Axiom's expectations regarding my job duties, as I remained responsible for its stakeholder interests and engagements in Washington D.C. On average, I was in Washington, D.C. at least three times per week throughout my time at Axiom, including following the closure of the coworking space.

21.     My role was not unique to Axiom, as companies across industries that depend on government authorizations and funding employ external-facing representatives to advocate for their interests on Capitol Hill. Representatives from companies in the same industry also commonly exchange information and work together to lobby stakeholders for additional funding or industry-wide policies. Because the focus of the job and the skills required are based on connections with stakeholders, rather than in-depth knowledge of a company's operations, it is common for such representatives to move between companies.

22.     My primary objectives as a Government Relations Manager at Axiom were to obtain more funding for CLD and the xEVA program, and Congressional authorizations to develop commercial space stations.  In addition to lobbying and networking with government stakeholders and industry associations, myself, Mr. Stout, and Ms. Armentrout would occasionally meet with representatives from the other participants in CLD, including Vast, to discuss lobbying strategy, policy positions, funding requests, regulatory rulemakings, and exchange information about

---

[2] While Axiom alleges that I worked with NASA individuals located in Texas as well as representatives from the Texas Congressional Delegation, I did not work with anyone from NASA in Texas and my work with any representatives from the Texas Congressional Delegation was limited to chaperoning Representative Brian Babin's D.C.-based staffers during a fundraiser that Axiom held for him in Texas. All interactions and engagements with local and state Texas officials were handled by a separate person who was not part of the Federal Government Relations team.

engagements with government stakeholders in order to work together towards these goals. These political and regulatory strategies, as well as government relations tactics, were inherently time-sensitive and perishable given that they evolved rapidly with political cycles.

23.    Separate from the Government Relations team, Axiom had a team responsible for working on responses to requests for information (RFIs) and requests for proposals (RPFs) from NASA, known as the Capture team. I never worked on any responses to RFIs or RFPs, and I did not discuss any information related to RFIs or RFPs with the Capture team and never viewed any responses to RFIs or RFPs.

24.    Axiom also had internal Science, In-Space Solutions (now Orbital Data Center), and Revenue teams responsible for confidential pricing and sales strategy. Throughout my time at Axiom, these teams were effectively siloed from the Government Relations team. While the Revenue and Government Relations teams were nominally placed under one umbrella (Global Strategy) following the last of several company reorganizations, the teams functionally remained separate business units.

25.    As my role primarily involved presenting information that could be shared with government stakeholders, industry associations, and other CLD participants, I was not involved in decisions by the Science, In-Space Solutions (now Orbital Data Center), or Revenue teams and was not privy to confidential sales or pricing information.



which was documented in public news sources[4] and on LinkedIn[5]. I was never involved in these efforts.

26. However, I never joined a single of those meetings because I had nothing to contribute and the ▮▮▮ did not impact my day-to-day duties whatsoever.

27. The only information regarding pricing I had access to at Axiom was an email that contained a high-level discussion of pricing in connection with a submission to ▮▮▮▮▮▮ I was only copied on this email because members of the Government Relations team were routinely copied on submissions to external government representatives, and I never opened the attachment to the email. The only other information I obtained regarding pricing was from public reporting in September 2024

---

[3] The Global Strategy team included the Government Relations team, State Government team, International Embassy team, and Business Development team. Mr. Stout oversaw the Global Strategy Team.

[4] *See* https://derechadiario.com.ar/us/argentina/milei-met-in-davos-with-axiom-spaces-ceo-to-advance-space-cooperation.

[5] *See* https://www.linkedin.com/posts/jonathan-cirtain-b718aa88_it-was-an-honor-to-meet-with-president-milei-activity-7420224627857256448-UJPB?utm_source=social_share_send&utm_medium=member_desktop_web&rcm=ACoAACF3IwgBUZPO_K6AhK_pgU4yrUwleKSN4Y.

regarding the average price of a PAM seat, which put the price for the seats around $40 million per seat.[6]

28.     Throughout my time as a Government Relations Manager, I never viewed any documents or discussed any information relating to nonpublic pricing, sales, or financial projections. Nor did I obtain any such information when I became a Senior Policy Manager, which was functionally the same role (as discussed below).

29.     While Axiom's Amended Complaint alleges I possess "competitive analysis regarding Axiom[]'s competitors," the only "competitive analysis" I am aware of refers to a PowerPoint presentation that was done several months ago using public information. My role in that analysis was to provide Congressional perception of the reputations for companies participating in CLD. It contained no information regarding pricing or sales strategy, nor did I review any such information in preparing the report. Moreover, I do not possess that document.

### iii.     My Change in Title to Senior Policy Manager.

30.     As a Government Relations Manager, I consistently received outstanding feedback and performance reviews, achieving the highest possible metric for most categories. Around December 2024, Mr. Stout stated that he was seeking to give me a title change and a promotion. Several months went by and around March 2025, during my annual performance review, Mr. Stout told me that if I hit my objectives and key results (OKRs) for the following year, I would receive a promotion.

31.     In September 2025, halfway through the year, Mr. Stout and Ms. Armentrout offered to change my title to Senior Policy Advisor but without the accompanying pay raise that would come with a "senior" title. I was disappointed but accepted the title change. I made clear

---

[6] *See* https://arstechnica.com/space/2024/09/a-key-nasa-commercial-partner-faces-severe-financial-challenges/.

that I expected a reconsideration of my salary in the upcoming performance review. Attached hereto as **Exhibit 4** is a true and correct copy of a September 26, 2025 letter from Ms. Armentrout confirming the change in my title to Senior Policy Advisor.

32. Despite the "promotion" to Senior Policy Advisor, my role at Axiom functionally remained the same, as they confirmed that there was ███████████████████████████ *See* **Exhibit 4**. Indeed, Axiom confirmed as much in my recent background check for Vast, in which they listed my job title as Government Relations Manager. Attached hereto as **Exhibit 5** is a true and correct copy of an April 11, 2026 Checkr Consumer Report indicating that Axiom's response for my position was "Federal Govt Relations Manager."

33. My next performance review was on March 4, 2026 with Ms. Armentrout. Leading up to the review, I repeatedly reminded Mr. Stout and Ms. Armentrout of my desire for my compensation to be reconsidered. Despite receiving the highest possible marks on most of my metrics in my performance review, I was informed that I would only receive a 3% raise in my salary. Attached hereto as **Exhibit 6** is a true and correct copy of a March 5, 2026 letter from Axiom's People & Culture team regarding my 2025 annual performance review and salary adjustment.

34. When I asked Ms. Armentrout why I received only a 3% raise, she stated that she did not believe that I deserved a further raise or that I was ready for a promotion. I told her that I vehemently disagreed with that assessment. I also informed Ms. Armentrout that I would be reaching out to the Human Resources Department to ask about how promotions worked at Axiom, and she stated that there was nothing they could do because she was the one who had decided that I was not ready. I then told her that I intended to reach out to Mr. Stout to discuss, and Ms. Armentrout responded that she would not be happy if I went above her head on this. The

10

disrespectful and condescending tone of that review made clear that Axiom's management did not value my contributions and had no intention of raising my salary. The same day, I told a colleague at Axiom that I planned on leaving the company.

### C. My Offer from Vast and Negotiations with Axiom.

35.     The same day as my review, I called Ms. Schenewerk, Chief Policy Officer at Vast, to express my interest in working with her.

36.     On March 15, 2026, I applied to the Director, Government Affairs and National Security Programs opening with Vast. On March 23, 2026, I had my first screening with Vast's Human Resources team. On April 7, 2026, I interviewed with Ms. Schenewerk and other Vast teammates at their Washington D.C. office.

37.     On April 10, 2026, I received an offer letter by email to join Vast as a Director of Policy and Government Relations in their Washington, D.C. office. The offer included an annual salary of $200,000. I signed the offer of employment from Vast on April 10, 2026. Attached hereto as **Exhibit 7** is a true and correct copy of my April 10, 2026 offer of employment from Vast.

38.     I immediately notified Ms. Armentrout that I was leaving Axiom and had decided to accept an opportunity at Vast, and that I had appreciated the opportunity to work with her. When I told her I was going to Vast to work with Ms. Schenewerk, she responded she knew Axiom might lose me to Vast when they hired Ms. Schenewerk in February 2026. Ms. Armentrout expressed remorse over how the performance review in March went, that it did not go as she wanted it to go, and that she would like to keep a professional and friendly relationship. I accepted her apology. I was logged out of my work-issued devices less than 30 minutes later. No exit interview was ever scheduled. Attached hereto as **Exhibit 8** is my April 10, 2026 email to Mr. Stout and Ms. Armentrout notifying them of my resignation from Axiom.

39.    On April 13, 2026, I received a voicemail from Axiom's Chief Legal Officer and General Counsel Tracey Davies, where she expressed her disappointment and asked to discuss the terms of my departure from Axiom as soon as possible. I immediately returned her call.

40.    Ms. Davies and I had a positive relationship at Axiom. On our call, Ms. Davies told me that she could not let me go to Vast, and that Axiom was preparing to file a lawsuit against me. Although I did not have access to any confidential pricing or strategy information, I assured Ms. Davies that I would never share any information with Vast that might be considered confidential. She offered to pay me my full annual salary at Axiom for the year in exchange for not joining Vast or any other participant in CLD.

41.    I responded that I would need to have a conversation with Vast, and asked Ms. Davies if Axiom would match my offered salary at Vast of $200,000. Ms. Davies told me that she would get back to me, as she did not have the necessary authorization. I have not spoken to her since. Instead, Axiom filed its Complaint the same day as this conversation took place.

42.    On April 14, 2026, I spoke with Nicole Linbeck at Axiom's Human Resources Department regarding returning any equipment that Axiom had given me to perform my job duties, including my laptop, two monitors, printer, keyboard, mouse, and company badges. Upon returning from a camping trip during the week, I immediately shipped all such equipment to Axiom on April 16, 2026. I did not download or access any files prior to returning such equipment.

### D.  My Employment with Vast.

43.    I started at Vast on Tuesday, April 14, 2026. As Director of Policy and Government Relations, my role involves leading the company's lobbying strategy on Capitol Hill, interfacing and working with relevant executive agencies, and positioning the company as a thought leader by participating in conferences, panels, and public events to advocate for the company's priorities.

As with my role at Axiom, this role is external-facing and involves advocating for Vast's positions with respect to funding and policy. Unlike with my role at Axiom, however, I will advocate for Vast's interests with respect to the U.S. Department of Defense, California local and state government officials, as well as represent its interests with respect to other parts of its space portfolio in addition to CLD.

44.     Though Axiom suggests that I am advising Vast in their response to NASA's March 25, 2026 RFI,[7] as noted above, I was not involved in the response to the RFI, and I never participated in any such meetings. Moreover, according to a recent announcement from NASA, the RFI is no longer going forward. Attached hereto as **Exhibit 9** is a true and correct copy of a June 1, 2026 post on X (formerly Twitter) from Bethany Stevens, NASA Senior Advisor and Press Secretary, responding to a post from Eric Berger, Senior Space Editor at Ars Technica, relating to NASA's announcement regarding the RFI.

45.     I advocate for not only Vast's interests, but also CLD participants generally, with respect to lobbying Congress for more funding for NASA. This requires me to keep up to date on appropriations and budget requests, such as the U.S. House Committee on Science, Space, and Technology's April 22, 2026 hearing on NASA's budget. This was a public hearing, and approximately 20-30 lobbyists on behalf of other CLD participants, as well as other aerospace companies and industry associations, were present.  My only responsibilities in  connection  with

---

[7] The March 25, 2026 RFI called for industry feedback on creating a government-owned "Core Module" that attaches to the International Space Station.

the hearing were to submit questions to staffers that their bosses (Members of the House of Representatives) might be interested in asking the witness at the hearing, NASA Administrator Jared Isaacman.

46.     As stated above, I did not retain any confidential information from Axiom, and even if I did, such information would not benefit me in my role at Vast. My role as Axiom's external-facing representative required knowledge of public information that could be shared with lawmakers and other industry stakeholders to advocate for Axiom and CLD participants generally. Information regarding Axiom's financial projections, business strategy, or pricing was not relevant to my goals as a lobbyist, nor was I part of those decisions. My job was limited to being a voice in Washington D.C. that government stakeholders could reach out to discuss policy and rulemaking in the commercial space sector. This is no different from my upcoming role at Vast.

47.     Since joining Vast, and to my knowledge, I have not used or disclosed any Axiom confidential information.  I have and will continue to fully honor my non-disclosure and non-solicitation obligations under the Agreement.

Dated: June 1, 2026

_____
Ramzi Masri-Elyafaoui

15

# Exhibit 1

## [Filed Under Seal]

# Exhibit 2

## [Filed Under Seal]

# Exhibit 3

## [Filed Under Seal]

# Exhibit 4

## [Filed Under Seal]

# Exhibit 5

## [Filed Under Seal]

# Exhibit 6

**[Filed Under Seal]**

# Exhibit 7

## [Filed Under Seal]

# Exhibit 8

## [Filed Under Seal]

# Exhibit 9



← **Post**

**Bethany Stevens** ✔ 🔵
@NASASpox

In the spirit of learning from past programmatic challenges and ensuring a responsible transition from the International Space Station, NASA evaluated both the current commercial space station approach and alternative pathways.

Industry has provided extensive feedback making the case for a sustainable commercial market in which NASA is one customer among many, along with assurances regarding available transportation capabilities. The industry position will now shape the path forward as NASA proceeds with the original commercial strategy.

Over the coming weeks, NASA will work with stakeholders and industry to refine flexible requirements and acquisition plans, with a draft RFP expected later this month.

> **Eric Berger** ✔ @SciGuySpace · 6h
> The NASA proposal to create a government-led "core module" to assist commercial space stations (CLDs) appears to be dead. Most of the CLD vendors will celebrate this.

3:44 PM · Jun 1, 2026 · **5,505** Views

💬 2          🔁 15          ♡ 48          🔖 8                    ⬆️